UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

800537 ONTARIO INC., d/b/a ACURA-
WEST and GREGORY LEON,

   Plaintiffs,

v.

AUTO ENTERPRISES, INC., WILLIAM
LUTHER, and PHILIP TRUPIANO,

   Defendants.
_____/

AUTO ENTERPRISES, INC.,

   Counter-Plaintiff,

v.

800537 ONTARIO INC., d/b/a ACURA-
WEST and GREGORY LEON,

   Counter-Defendants.
_____/

Case No. 99-75615

Honorable Patrick J. Duggan

## OPINION AND ORDER DENYING PLAINTIFFS' MOTION TO EXCLUDE THE TAX COURT OF CANADA'S FINDINGS OF FACT AND/OR THE EVIDENCE PRESENTED TO THE TAX COURT OF CANADA

At a session of said Court, held in the U.S.
District Courthouse, City of Detroit, County of
Wayne, State of Michigan, on November 10, 2005.

PRESENT: THE HONORABLE PATRICK J. DUGGAN
U.S. DISTRICT COURT JUDGE

This lawsuit arose from Acura-West's and Gregory Leon's sale of automobiles to

1

Auto Enterprises, Inc. ("Auto Enterprises"), which Auto Enterprises imported into the United States, and Auto Enterprises' application and receipt of refunds or rebates from the Canadian Government for Goods and Services Taxes that Acura-West ("Acura-West") and Gregory Leon ("Leon")(collectively "Counter-Defendants") claim they never collected on those sales. Presently before the Court is Counter-Defendants' motion to exclude the Tax Court of Canada's findings of fact and/or the evidence presented to the Tax Court of Canada.

In their motion, Counter-Defendants ask the Court to rule that Auto Enterprises may not offensively assert collateral estoppel to bar them from re-litigating issues decided by the Tax Court of Canada. Counter-Defendants also ask the Court to rule that Auto Enterprises may not introduce the Tax Court of Canada's findings of fact because such findings constitute inadmissible hearsay and admitting those findings would be unfairly prejudicial. Counter-Defendants further ask the Court to rule that if Margaret Clark, an investigator with the Canadian Customs and Revenue Agency ("CCRA"), is unavailable to testify, then only the written interrogatories completed by Ms. Clark during discovery should be admitted into evidence. In the event Ms. Clark is available to testify, Counter-Defendants seek to limit her testimony in certain respects.

## I. Factual and Procedural Background

Acura-West is a Canadian automobile dealership, located in London, Ontario. Leon is Acura-West's principal owner. Auto Enterprises, a Michigan corporation with its principal place of business in Michigan, is in the business of purchasing automobiles from

2

Canadian car dealerships and importing those vehicles into the United States for resale. Philip Trupiano ("Trupiano") and William Luther ("Luther") own Auto Enterprises.

Pursuant to Canadian law, the Canadian Government collects a 7% Goods and Services Tax ("GST") on the sale of goods. When a purchaser buys goods for export outside of Canada, however, the sale is exempt from the GST. Sellers and buyers can complete GST-exempt sales in one of two ways. Under one scenario, the Canadian seller can collect GST from the buyer at the time of sale and remit that amount to the Canadian Government. With proof of export, the purchaser then may seek a refund or rebate from the Canadian Government for the amount of GST it paid. Under the other scenario, the Canadian seller simply does not collect GST. The seller therefore remits no funds to the Canadian Government and the purchaser has no reason to seek a rebate.

Between December 1994 or February 1995 and November 1996, Acura-West sold approximately 108 vehicles to Auto Enterprises that Auto Enterprises imported into the United States. Acura-West claims that it did not collect GST on these sales and it prepared invoices reflecting that the sales were GST exempt (the "GST-exempt invoices"). Auto Enterprises claims it neither saw nor received these invoices until this lawsuit. In fact, Auto Enterprises claims it paid Acura-West GST and, at the time of the transactions, Acura-West provided it with invoices reflecting GST due on each transaction (the "GST-paid invoices"). Leon acknowledges preparing the GST-paid invoices, but claims he prepared them, not as invoices, but only to assist Auto Enterprises' importation of the vehicles into the United States.

After Auto Enterprises imported the vehicles it purchased from Acura-West into the United States, it sought and received rebates from the Canadian Government for the GST it claims it paid the Canadian dealership. Auto Enterprises submitted the GST-paid invoices with its rebate applications as proof that it paid GST on the transactions.

In the late Spring or early Summer of 1997, the CCRA– the government entity in charge of administering and enforcing the GST– became suspicious of the transactions between Acura-West and Auto Enterprises. The CCRA began investigating the dealerships' transactions and ultimately concluded that Acura-West collected GST from Auto Enterprises. During its investigation, however, the CCRA held Auto Enterprises' pending GST rebate applications in abeyance, although none of these applications related to transactions between Auto Enterprises and Acura-West.

In February 1999, the CCRA sent Acura-West a "Notice of Assessment" in the amount of $457,21.56, which included $248,346.27 of GST Acura-West allegedly collected from Auto Enterprises but failed to remit to the Canadian Government, plus interest and penalties. The CCRA also initiated criminal court proceedings against Acura-West.[1] Acura-West disputed the CCRA's tax assessment, but paid the assessment to mitigate its damages. The dealership subsequently filed a civil action in the Tax Court of Canada to reverse the assessment, contending that Auto Enterprises had not paid GST on the transactions.

---

[1] At some point after this lawsuit was filed, the CCRA stayed the criminal proceedings against Acura-West and those proceedings eventually were dropped.

Meanwhile, on November 19, 1999, Acura-West and Leon filed a complaint in this Court against Auto Enterprises, Trupiano, and Luther alleging the following claims arising from the above-described transactions: violation of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c); breach of contract; fraudulent, negligent and/or innocent misrepresentation; and unjust enrichment.[2] Auto Enterprises filed a counter-complaint against Acura-West and Leon alleging, *inter alia*, violations of RICO and breach of contract. On December 11, 2003, a jury trial commenced on the parties' claims.

On December 18, 2003, the jury reached a verdict with respect to the parties' RICO claims and breach of contract claims.[3] The jury rejected the breach of contract claims brought by the parties. As to their RICO claims, the jury found that both sides proved all of the elements necessary to establish a RICO violation, but the jury only awarded damages to Acura-West and Leon. Auto Enterprises subsequently filed a motion for new trial pursuant to Rules 49 and 59 of the Federal Rules of Civil Procedure. On May 21, 2004, this Court granted Auto Enterprises' motion, holding that the jury's verdicts with respect to the parties' RICO claims were inconsistent. The Court therefore ordered a new trial on those claims.

---

[2]Acura-West and Leon also named World Imports U.S.A., Inc., Claus Lukner, and Jake Sydorowicz as defendants (collectively "the World Imports Defendants"). Early in the litigation, however, this Court held that it lacked personal jurisdiction over the World Imports Defendants and dismissed the claims against them.

[3]The parties' remaining claims did not reach the jury.

In the meantime, Acura-West's civil action in the Tax Court of Canada to reverse the CCRA's assessment progressed before the Honorable Associate Chief Justice D.G.H. Bowman ("Judge Bowman"). In that proceeding, Acura-West claimed the CCRA's assessment was improper because Acura-West in fact had not collected GST on its transactions with Auto Enterprises. As proof of its claim, Acura-West submitted the GST-exempt invoices from the parties' transactions. On June 21, 2004, the Tax Court of Canada ruled against Acura-West. *See* Auto-Enterprises' Mot. Ex. 1. In his Judgment, Judge Bowman concluded that the GST-paid invoices represented the actual contract of sale between Acura-West and Auto Enterprises. Judge Bowman therefore found that Acura-West collected GST from Auto Enterprises and was obligated to remit that amount to the CCRA. Acura-West has appealed Judge Bowman's decision. *See* Pls.' Resp. at 2 & Ex. A.

Acura-West and Leon now ask this Court to find that they should not be barred under the doctrine of collateral estoppel from relitigating– in defense of Auto Enterprises' RICO claim and in conflict with the Canadian Tax Court's findings– that the GST-exempt invoices represent the actual sales contracts between the parties.[4] In other words,

---

[4]The Court finds that, contrary to Acura-West's and Leon's assertion, Auto Enterprises did not abandon its offensive collateral estoppel argument in its Renewed Motion for Summary Judgment, filed July 20, 2004. There was no reason for Auto Enterprises to file a motion for summary judgment with respect to its RICO claim against Counter-Defendants based on collateral estoppel since application of the doctrine would not have resolved the claim in its entirety. Auto Enterprises must establish other elements to prevail on its claim.

Counter-Defendants seek to preclude Auto Enterprises from using collateral estoppel offensively to establish that the purchase price agreed to by the parties in their transactions included GST and that Auto Enterprises paid GST to Acura-West that Acura-West should have remitted to the Canadian Government.

## II. Comity and Offensive Collateral Estoppel

As the Court stated in its November 4, 2004 Opinion and Order Granting Auto Enterprises' Renewed Motion for Summary Judgment, the United States Supreme Court has recognized foreign judgments and proceedings pursuant to principles of comity for more than a century. *Hilton v. Guyot*, 159 U.S. 113, 16 S. Ct. 139 (1895). "Comity" refers to "the recognition which one nation allows within its Territory to the legislative, executive, or judicial acts of another nation, having due regard both to internal duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." *Id*. at 143, 16 S. Ct. at 164. As this Court also held in its November 4 Opinion and Order, Canadian judgments have long been viewed by courts in the United States as satisfying the requirements articulated by the *Hilton* Court as necessary before a court in this country will preclude a party from re-litigating issues decided in a foreign tribunal. This Court has found no other strong public policy reasons for not recognizing the Tax Court of Canada's Judgment and has concluded that it should recognize that Judgment.

Once a court finds that a foreign tribunal's proceedings satisfy American standards of due process and that there are no other reasons for not recognizing those proceedings,

the court's focus should turn to the requirements of collateral estoppel. As now United States Supreme Court Justice Souter wrote as a Justice for the Supreme Court of New Hampshire:

> We . . . follow the lead of the Restatement (Third) of the Foreign Relations Law of the United States . . . which minimizes reliance on comity, and concentrates instead on the substance of such issues of enforcement or preclusion as might otherwise be glossed over by the use of the term. Like the Restatement, then, we will speak no further of comity, but will turn instead to consider specifically the conditions under which judgments are recognized for the purpose of subsequently establishing the facts upon which they rest.
> . . .
> Nothing in these principles [i.e. the conditions required for collateral estoppel] is incompatible with their application to determine the recognition properly due to a judgment rendered in a foreign national state, and, as the parties have assumed, Canadian judgments are generally cognizable in courts of the United States . . . and in most respects will be accorded "the same degree of recognition to which sister State judgments are entitled."

*Petition of Breau*, 565 A.2d 1044, 1049-50 (N.H. 1989)(quoting Restatement (Second) of Conflict of Laws § 98, *comment b* at 298). In *Petition of Breau*, the New Hampshire Supreme Court upheld the State Board of Education's reliance on findings of fact made by a Canadian administrative body under the doctrine of collateral estoppel in deciding to revoke a teacher's credentials. Following Justice Souter's advice, the Court will now turn to the requirements for collateral estoppel.

The doctrine of collateral estoppel applies only when the following conditions are satisfied:

8

> (1) the issue in the subsequent litigation is identical to that resolved in the earlier litigation, (2) the issue was actually litigated and decided in the prior action, (3) the resolution of the issue was necessary and essential to a judgment on the merits in the prior litigation, (4) the party to be estopped was a party to the prior litigation (or in privity with such a party), and (5) the party to be estopped had a full and fair opportunity to litigate the issue.

*Hammer v. Immigration and Naturalization Service*, 195 F.3d 836, 840 (6th Cir. 1999). As this Court also found in its November 4 Opinion and Order, these five conditions are satisfied.[5] Nevertheless, Counter-Defendants argue that Auto Enterprises should be barred from using collateral estoppel because it seeks to use the doctrine to preclude Counter-Defendants from relitigating factual findings, not legal conclusions.

In *Hammer*, however, the Sixth Circuit upheld the Board of Immigration Appeals' application of the doctrine of collateral estoppel in the petitioner's deportation proceedings to findings of fact made by the district court in denaturalization proceedings involving the same petitioner with respect to his date of birth, rank and service during World War II as a concentration camp guard and prison transport guard, and the conditions at the concentration camps. *Id*. at 843. Thus *Hammer* demonstrates, contrary to Counter-Defendants' assertion, that collateral estoppel applies to legal as well as factual issues (i.e. factual findings) rendered in a prior action. *Id*.; *see also Petition of Breau*, 565

---

[5] While only Acura-West was a party in the Canadian proceedings, clearly Acura-West and Leon, its principal owner, are in privity. *See Sanders Confectionary Prods., Inc. v. Heller*, 973 F.2d 474, 481, 485 (6th Cir. 1992)(holding that chairperson and president of company were bound to a decision against the company because they controlled the company and therefore were in privity with it).

A.2d at 1048 (affirming New Hampshire Board of Education decision where "the State board's order recited that 'we accept the [Canadian administrative body] findings as final findings of fact,' and the board's use of the Canadian findings thus served the affirmative purpose of 'offensive' collateral estoppel.") Moreover in *Parklane Hosiery Company v. Shore*, the Supreme Court affirmed the Second Circuit Court of Appeals' decision that "[a] party who has had issues of fact determined against him after a full and fair opportunity to litigate in a nonjury trial is collaterally estopped from obtaining a subsequent jury trial of these same issues of fact." 439 U.S. 322, 325, 99 S. Ct. 645, 648 (1979).

In the present case, Auto Enterprises seeks to use the Canadian Tax Court's factual findings offensively.[6] The Supreme Court discussed particular concerns that arise when a party seeks to use the doctrine of collateral estoppel offensively in *Parklane Hosiery*. In that case, a stockholder brought a class action lawsuit against a corporation, its officers, directors, and other stockholders for allegedly issuing a materially false and misleading proxy statement. Before the class action came to trial, the Securities and Exchange

---

[6]As the Supreme Court has explained:
> [O]ffensive use of collateral estoppel occurs when the plaintiff seeks to foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action with another party. Defensive use occurs when a defendant seeks to prevent a plaintiff from asserting a claim the plaintiff has previously litigated and lost against another defendant.

*Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n.4, 99 S. Ct. 645, 649 n.4 (1979).

Commission filed suit against the same defendants (the "SEC lawsuit") alleging that the proxy statement was materially false and misleading in essentially the same respects as those that had been alleged in the class action lawsuit. After a four-day bench trial, the district court presiding over the SEC lawsuit found that the proxy statement was materially false and misleading in the respects alleged and entered a declaratory judgment to that effect. The Court of Appeals subsequently affirmed this judgment. The stockholder then moved for partial summary judgment in the class action lawsuit asserting that the defendants were collaterally estopped from relitigating the issues that had been resolved by the district court.

In determining whether offensive use of the doctrine should be permitted, the *Parklane Hosiery* Court considered several reasons advanced against its use. First, that it promotes a "wait and see" approach.[7] Second, that in certain situations it may result in unfairness to a defendant, such as: (1) if the defendant was sued in the first action for small or nominal damages and therefore had little incentive to defend that case vigorously; (2) if the judgment relied upon as a basis for the estoppel is inconsistent with

---

[7]As the Court described, "[s]ince a plaintiff will be able to rely on a previous judgment against a defendant but will not be bound by that judgment if the defendant wins, the plaintiff has every incentive to adopt a 'wait and see' attitude, in the hope that the first action by another plaintiff will result in a favorable judgment." *Parklane Hosiery*, 439 U.S. at 330, 99 S. Ct. at 651. In comparison, "defensive collateral estoppel gives a plaintiff a strong incentive to join all potential defendants in the first action if possible" since the plaintiff will be precluded from subsequently relitigating the same issue against other adversaries if he or she lost in the first lawsuit. *Id*. at 329-30, 99 S. Ct. at 651.

one or more previous judgments in favor of the defendant; or (3) if the second action affords the defendant procedural opportunities unavailable in the first action. *Id*. at 329-331, 99 S. Ct. at 650-51. After considering these arguments, the Supreme Court reached the following conclusion:

> . . . the preferable approach for dealing with [these concerns] is not to preclude the use of offensive collateral estoppel, but to grant trial courts broad discretion to determine when it should be applied. The general rule should be that in cases where a plaintiff could easily have joined in the earlier action or where, either for the reasons discussed above or for other reasons, the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel.

*Id*. at 331, 99 S. Ct. at 651-52. Applying this general rule to the case before it, the Supreme Court concluded that offensive use of the doctrine of collateral estoppel was appropriate. *Id*. at 331-32, 99 S. Ct. 652.

Specifically, the Court found that since the stockholder could not have joined in the SEC lawsuit even if he had desired, the case did not present a situation where the application of offensive collateral estoppel would reward a party who waited to see whether the previous action resulted in a favorable or unfavorable result for the other party. *Id*. In light of the serious allegations made in the SEC's complaint as well as the foreseeability of subsequent private suits, the Court also found that the defendants in the SEC lawsuit "had every incentive to litigate the SEC lawsuit fully and vigorously." *Id*. The Court further noted that the district court' decision in the SEC lawsuit was not inconsistent with any previous decision. Finally, the Court held that the class action

lawsuit did not provide any procedural opportunities that were unavailable to the defendants in the SEC action "of a kind that might be likely to cause a different result." *Id*. The Court specifically rejected the petitioners' argument that a defendant's Seventh Amendment right to a jury trial would be violated if offensive collateral estoppel were used in a situation where the issue for which estoppel was being applied had been decided in a previous action without a jury. *Id*. at 337, 99 S. Ct. at 655.

For the same reasons, this Court concludes that it is not unfair to Counter-Defendants to allow Auto Enterprises to use the doctrine of collateral estoppel offensively. First, Auto Enterprises could not have joined in the Canadian proceedings. Second, Acura-West had every incentive to vigorously litigate its appeal of the CCRA assessment. The assessment was for a significant amount of money. Additionally, this lawsuit already was pending and therefore Acura-West and Leon were aware that the outcome in the Canadian Tax Court could affect the issues to be litigated in these proceedings. Third, there are no other judgments inconsistent with the Tax Court's Judgment.[8] Finally, aside from the fact that the Canadian Tax Court's findings were rendered by a judge rather than a jury– an argument against the use of offensive collateral

---

[8]Counter-Defendants argue that the jury's verdict in the first trial in this case is inconsistent with Judge Bowman's Judgment. But while the jury in the first trial answered "yes" to each element of Acura-West's and Leon's RICO claim, the jury also answered "yes" to each element of Auto Enterprises' RICO counter-claim. As a result, there is no way to determine whether the jury concluded, contrary to the Canadian Tax Court, that Acura-West and Leon did not charge Auto Enterprises GST in the parties' transactions.

estoppel that specifically was rejected by the Supreme Court– Counter-Defendants have not identified any procedural opportunities unavailable to Acura-West in that proceeding that will be available in the pending matter.[9] While Counter-Defendants contend that the Tax Court relied on evidence that would constitute inadmissible hearsay in the present proceedings, Counter-Defendants fail to point to any specific information considered by Judge Bowman that will not be submitted to the jury in this case through admissible sources. Finally, the fact that Acura-West has appealed the Canadian Tax Court's Judgment does not persuade the Court that Auto Enterprises should not be permitted to offensively use the doctrine of collateral estoppel in this case.

As stated in the Court's November 4, 2004 Opinion and Order, it is firmly established that issue preclusion only requires a judgment that is final in the court rendering it, even though it is subject to appeal or may be on appeal. *See, e.g., Erebia v. Chrysler Plastics Prod. Corp.*, 891 F.2d 1212, 1215 n.1 (6th Cir. 1989); CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4433 at 78-82 (2d ed. 2002). Counter-Defendants contend that if the Canadian Tax Court's Judgment is reversed on appeal, the integrity of any potential judgment obtained by Auto Enterprises in this litigation will be undermined and a third

---

[9]In the Canadian proceedings, Acura-West was allowed to engage in extensive discovery, it called several witnesses in support of its challenge to the assessment, and was able to cross-examine the CCRA's witness. Additionally, the Tax Court reached its judgment following twelve days of trial.

trial in these proceedings may become necessary.[10] This Court is unpersuaded, however, that the findings of fact made by the Canadian Tax Court should not be granted preclusive effect due to the impact a subsequent reversal of that court's decision may have on these proceedings.

The Court therefore concludes that Auto Enterprises should not be prevented from offensively asserting collateral estoppel to bar Counter-Defendants from relitigating issues raised in and decided by the Canadian Tax Court. Finally, the Court will address Counter-Defendants' arguments with respect to Ms. Clark prior to the start of the trial in this matter, at which time it should be clearer whether Ms. Clark will be available to testify.

Accordingly,

**IT IS ORDERED**, that Counter-Defendants' motion is **DENIED**.

s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:
Sheri B. Cataldo, Esq.
Timothy D. Wittlinger, Esq.

---

[10]Counter-Defendants raise this concern now; however, the Court notes that when the first jury verdict was rendered in the present matter arguably in Counter-Defendants' favor, they immediately attempted to persuade the Canadian Tax Court to recognize that judgment even though a motion for new trial was pending in the present matter which could– and in fact did– result in a partial reversal of that judgment and even though the verdict could have been appealed to the Sixth Circuit.